UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO.: 4:04-CV-87-M

CITY OF OWENSBORO and                                            PLAINTIFFS
CITY UTILITY COMMISSION OF THE CITY
OF OWENSBORO, KENTUCKY, a/k/a
OWENSBORO MUNICIPAL UTILITIES

V.

KENTUCKY UTILITIES COMPANY                                       DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on cross-motions for partial summary judgment by Plaintiffs, City of Owensboro ("City") and Owensboro Municipal Utilities ("OMU"), and Defendant, Kentucky Utilities Company ("KU"), on the interpretation of the Facilities Charge Fund Provision of the Contract [DN 295, DN 279]; on the interpretation of the Green River Clause [DN 315, DN 296]; and on the NOx Emission Allowance Issue [DN 316, DN 310].  KU has also filed a motion for a hearing on the Green River Clause issue [DN 298].  Fully briefed, these matters are ripe for decision.

## I.  LEGAL STANDARD

In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The moving party bears the initial burden of specifying

the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. Celotex  Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

## II.  BACKGROUND

This case arises out of a longstanding wholesale electricity supply contract between the City, OMU, and KU.  The original contract was entered into in 1960 and governed the rates, terms, and conditions of service for wholesale electric energy between the two companies.  The contract has been amended several times from 1968 to 1998.  The 1960 Contract called for the construction of a new generating unit, now known as the Elmer Smith Generating Station ("ESGS").  According to the 1960 Contract, the City and OMU would finance, construct, own and operate ESGS.  The Contract allowed KU to purchase excess power at cost in exchange for the payment of certain costs associated with the generating unit.  Various changes in the electric energy industry and in the relationship between OMU and KU have spawned this litigation.

The parties have now filed numerous dispositive motions regarding the application of certain provisions contained in the contracts in question.  The Court will address these motions in turn.

## III.  FACILITIES CHARGE FUND PROVISION

The parties have filed cross-motions for summary judgment concerning the proper

2

interpretation of the Facilities Charge Fund provision, which is contained in Section 5 of the 1991 Supplemental Agreement to the 1960 Contract between OMU and KU [DN 295, DN 279]. Section 5 of the 1991 Supplemental Agreement reads in relevant part:

> A new fund shall be established called the "Facilities Charge Fund". This fund shall belong to the Commission and shall be the Company's total obligation toward decommissioning St. 2. Beginning January 1, 2001 the Company shall pay into this fund an amount of $2.03 per KW/month, based on **capacity allocations each month**, until the end of the Contract as extended by this Supplemental Agreement. The interest on this account will belong entirely to the Commission.

(1991 Supplemental Agreement, Section 5.)

The question presented here is the meaning of the phrase "**capacity allocations each month**." KU argues that the phrase refers to the same monthly capacity allocations prescribed by Article III, Section 3 of the 1960 Contract for allocation of all "capacity costs" of ESGS. OMU contends that Article III, Section 2 of the 1960 Contract defines the allocation of capacity between the parties.

### A. Article III, Section 2

Article III, Section 2 of the 1960 Contract provides that OMU is entitled to use as much capacity and energy output from ESGS as it needs to serve the City, its inhabitants, and other consumers in its service area, and KU is allocated the energy which is left over. Specifically, Article III, Section 2 provides:

> Section 2. Allocation of Capacity and Electricity Energy from Station 2. The Commission shall have the right to take such part of the capacity and electric energy output of Station 2 as it elects to take to supply the City, its inhabitants and other ultimate consumers in its service area, as hereinafter defined in Article VII, with heat, light and power and any surplus capacity and electric energy then remaining shall be available to the Company. Nothing herein

3

contained shall prevent the Commission from including in its load to be taken from this Station the load that is required by Green River Rural Electric Cooperative Corporation for sale to its ultimate consumers and any normal increase of the Cooperative's load.

(1960 Contract, Article III, Section 2.)

## B.  Article III, Section 3

Article III , Section 3 of the 1960 Contract sets forth the allocation of costs of ESGS

between the parties.   Section 3 categorizes all costs of ESGS as either "energy costs,"

"capacity costs" or "other costs." Article III, Section 3 provides in relevant part:

> Section 3.   Allocation of Costs.   Commencing on the date of Commercial Operation the capacity and energy costs associated with Station 2 and associated facilities shall be distributed between the Commission and the Company in accordance with the following:
> (a) Capacity Cost Allocation.   All capacity cost shall be allocated monthly on the basis of the proportionate amount of generating capacity allocated for use by each party.   Allocated capacity shall be determined as stipulated in "Capacity Determinations" hereinafter set forth in Article III, Section 3(d). . . .
> (b) Energy Cost Allocation.   All energy costs of operation shall be allocated monthly on the basis of the number of net kilowatt hours of energy used by each party from Station 2. . . .
> (c) Other Cost Allocation.   Any cost not allocated under the preceding sub-paragraphs (a) and (b) shall be allocated on a capacity basis.

(1960 Contract, Art. III, § 3(a),(b), (c).)

As stated above, Article III, Section 3(a)  provides that "capacity cost" shall be

allocated monthly on the basis of the proportionate amount of generating capacity allocated

for use by each party.   The contract then expressly states that allocated capacity shall be

determined as stipulated in Article III, Section 3(d).  Section 3(d) states that OMU's monthly

"allocated capacity" is equal to OMU's highest single hour of demand in the previous 12-

4

month period, plus 15 percent, while the remainder of the ESGS' net capacity is allocated

to KU.  Specifically, Article III, Section 3(d) provides:

> 5.  The capacity of Station 2 allocated for use by the Commission in any
> one month shall be the highest 60-minute integrated kilowatt demand in such
> month, plus 15%, which the Commission imposes on the 69 KV level of
> Station 2.  Such allocated capacity shall not be less than that established in any
> one of the previous 12 months, provided, however, that such allocated capacity
> shall not be less than 25,000 KW at any time.  The demands imposed by the
> Commission on Station 2 at the 69 KV level, as the result of emergency or
> scheduled maintenance as hereinafter defined, shall be excluded from such
> determination.
> 6.  The capacity of Station 2 allocated to the Company shall be the
> difference between the established capacity of Station 2 and the capacity
> allocated for use by the Commission.

(1960 Contract, Art. III, § 3(d).)

## C.  Discussion

### 1.  Contract Language

OMU argues that the Facilities Charge Fund payment is based upon the fixed rate of

$2.03 per KW/month applied against the surplus capacity available to KU in each month as

defined in Article III, Section 2.  OMU maintains that the Facilities Charge Fund payment

is independent from the "Capacity Cost Allocation" in Article III, Section 3.  OMU contends

that Article III, Section 2 describes OMU's entitlement to the physical capacity from ESGS,

while Article III, Section 3(a) specifies how capacity costs are to be calculated and allocated

and Article III, Section 3(b) specifies how energy costs are to be calculated and allocated.

OMU argues that the Facilities Charge Fund payment is neither a capacity cost nor an energy

cost to be allocated under Section 3 of Article III.  Instead, according to OMU, the Facilities

Charge Fund is a completely new fund and the Facilities Charge Fund rate contained in the 1991 Supplemental Agreement describes a "charge" to be paid by KU, not a "cost" to be allocated between OMU and KU under Article III, Section 3(d).

Additionally, OMU argues that if the parties intended the "capacity allocations each month" to mean the capacity **cost** allocation under Section 3(a) and (d) of Article III, they could have simply stated that. Instead, no reference is made in the Facilities Charge Fund paragraph of Section 5 of the 1991 Supplemental Agreement to "capacity cost allocation" under Article III, Section 3 of the Contract, and therefore, according to OMU, Article III, Section 3 does not define "capacity allocations." Instead, OMU contends KU's "allocation of capacity" under Article III, Section 2, is the surplus capacity available each month after OMU takes the capacity it elects from Station 2. Under OMU's interpretation, the Facilities Charge Fund rate is a fixed stated charge of $2.03 per KW/month applied against the surplus capacity available to KU after OMU's maximum demand on the capacity of Station 2 each month.

KU disagrees and argues that the phrase "capacity allocations each month" refers to the same monthly capacity allocations prescribed by Article III, Section 3 of the 1960 Contract for allocation of all "capacity costs" of ESGS. KU maintains that it is undisputed that the parties have used the precise term "capacity allocations" no less than fifteen other times in the 1960 Contract and its various amendments, and that in every one of those instances, the phrase was used in reference to the Article III, Section 3(d) formula. KU contends that the Facilities Charge Fund provision contains no language expressing any

intent to depart from this formula when determining the "capacity allocations" used to calculate KU's payments to the Fund.  Additionally, KU points out that the alternative "capacity allocation" formula advanced by OMU has never before been used by the parties to calculate any costs or charges under the Contract.

The interpretation of a contract is a question of law for the Court to decide.  Equitania Insurance Co. v. Slone & Garrett, P.S.C., 191 S.W.3d 552, 556 (Ky. 2006).  "In construing a contract, a court's primary objective is to ascertain and to effectuate the intention of the parties to the contract from the contract itself."  Logan Fabricom, Inc. v. AOP Partnership LLP, 2006 WL 3759412, *2 (Ky. App. December 22, 2006).  In the absence of ambiguity, a written instrument will be enforced strictly according to its terms, and a court will interpret a contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence.  Frear v. P.T.A. Industries, Inc., 103 S.W.3d 99, 106 (Ky. 2003).  "An ambiguous contract is one capable of more than one different, reasonable interpretation."  Central Bank & Trust Co. v. Kincaid, 617 S.W.2d 32, 33 (Ky. 1981).  See also Cantrell Supply, Inc. v. Liberty Mut. Ins. Co., 94 S.W.3d 381, 385 (Ky. App. 2002); Lexicon, Inc. v. Safeco Ins. Co. of America, Inc., 436 F.3d 662 (6th Cir. 2006).  Yet if the terms of the contract are definite, "an otherwise unambiguous contract does not become ambiguous when a party asserts--especially post hoc, and after detrimental reliance by another party--that the terms of the agreement fail to state what it intended."  Frear, 103 S.W.3d at 107.  See also Cantrell Supply, Inc., 94 S.W.3d at 385 ("The fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous

terms.").

After review of the 1960 Contract, its subsequent amendments and the parties arguments, the Court finds the provisions here are not ambiguous. Therefore, the Contract and subsequent amendments related to this issue will be interpreted by the ordinary meaning of its terms rather than by what the parties say was intended.

The Court finds that the only reasonable interpretation of Section 5 of the 1991 Supplemental Agreement is that the phrase "capacity allocations each month" refers to the capacity allocations formula contained in Article III, Section 3(d). It is true, as argued by OMU, that Article III, Section 3(a) deals with cost allocations. However, those cost allocations are made monthly, "on the basis of the proportionate amount of generating capacity allocated for use by each party" and the allocated capacity "shall be determined as stipulated . . . in Article III, Section 3(d)." (1960 Contract, Article III, § 3(a).) Therefore, if one seeks to determine the capacity allocated each month, there is but one place in the Contract to look, and that is in Article III, Section 3(d).

Significantly, Section 1 of the 1991 Supplemental Agreement provides that "[a]ll terms used in this 1991 Supplemental Agreement, including those used in the preamble, shall have the same meanings as such terms are given in said Contract, unless defined otherwise herein." (1991 Supplemental Agreement, § 1, p. 2.) Additionally, Section 11 of the 1991 Supplemental Agreement incorporates by reference all provisions of the prior Contract "except as modified, changed or eliminated by the specific terms" of the 1991 Supplemental Agreement. (1991 Supplemental Agreement, § 11, p. 5.) The 1991 Supplemental Agreement

8

does not contain any new or different definition of the phrase "capacity allocations."  Nor does the 1991 Amendment define any formula for calculating the "capacity allocations" differently than the manner prescribed by Article III, Section 3(d) of the 1960 Contract.

While OMU relies heavily on the fact that Section 5 of the 1991 Supplemental Agreement does not reference Article III, Section 3(d), the Court finds it more significant that Section 5 does not reference Article III, Section 2 as the measure of the capacity allocations.  Instead, throughout the 1960 Contract and its amendments, the parties repeatedly used the phrase "capacity allocations" to refer to the Article III, Section 3(d) formula.  In fact, the phrase "capacity allocations" appears six times in the 1960 Contract, three times in the 1969 Supplemental Agreement, three times in the 1988 Supplemental Agreement, and two times in the 1991 Supplemental Agreement.[1]

In the 1960 Contract and amendments, the parties repeatedly use the phrase "capacity allocations" when calculating monthly contributions to certain "funds."  See, e.g., 1960 Contract, Article IV, § 1, p. 15 ("If the cash in [the Working Capital Fund] falls below $100,000 . . . either the Commission or the Company may require such cash to be restored to $100,000 by monthly contributions in the aggregate amount of $15,000 from the

---

[1] For instance, the second paragraph of Section 5, which immediately precedes the Facilities Charge Fund clause, states that the parties' contributions for the cost of certain replacements and additions at ESGS "shall be allocated between the Commission and the Company in proportion to their respective Capacity Allocations determined for the month of May immediately preceding the fiscal year for which the itemization and estimate was provided."  (1991 Supplemental Agreement, § 5, p. 3).  OMU acknowledges that the phrase "Capacity Allocations" used in this provision refers to the Article III, Section 3(d) formula.

9

Commission and the Company contributed on the basis of *capacity allocation*."); Article IV, § 2, p. 16 ("If the Station 2 Additions and Replacement Fund falls below $200,000, either the Commission or the Company may require such fund to be restored to $200,000 by monthly contributions in the aggregate amount of $15,000 from the Commission and the Company, contributed on the basis of *capacity allocation*."); Article IV, § 3, p.16 ("Funds to provide for any agreed increase in the coal reserve beyond that initially established shall be borne by the Commission and the Company on the basis of *capacity allocation.*"); 1969 Supplemental Agreement, Article IV, §§ (a)-(c), pp. 6-7; 1988 Amendment, Article V, §§ 4-6, pp. 9-10. While the phrase "capacity allocations" is sometimes capitalized (as in the 1988 Amendment) and sometimes not (as in the 1960 Contract and the 1969 Amendments), OMU does not dispute that in every one of the instances set forth above, the phrase "capacity allocation" is used to refer to the Article III, Section 3(d) formula.  However, OMU maintains that the distinction between these provisions and the Facilities Charge Fund provision is that the cited provisions pertain to an allocation of "costs," whereas the Facilities Charge Fund provision involves no cost to be allocated, but is simply a charge KU is to pay to OMU to fund future decommissioning of the plant.

The Court finds that OMU's distinction between "costs" and "charges" provides no valid reason for concluding that the phrase "capacity allocations" in the Facilities Charge Fund provision means something different than it does everywhere else in the Contract and the subsequent amendments.  Whether or not KU's payments under the Facilities Charge Fund provision are considered "costs," the parties' uniform use of the phrase "capacity

10

allocations" as defined under the Article III, Section 3(d) formula warrants the conclusion that the use of "capacity allocation" in the Facilities Charge Fund clause was intended to be defined under that same formula. If the parties had intended the Facilities Charge Fund provision to be the only place in the Contract and amendments where the phrase "capacity allocations" refers to Article III, Section 2, rather than Article III, Section 3(d), the parties were required to expressly indicate their intent to change the definition of capacity allocation for that particular provision pursuant to Section 1 of the 1991 Amendment.

For these reasons, the Court finds that the phrase "capacity allocations each month" as used in the Facilities Charge Fund clause should be given the same meaning it has consistently in all other provisions of the Contract and amendments.

### 2. Ambiguity

Even if the Court were to conclude that the phrase "capacity allocations each month" was ambiguous, the Court would find that extrinsic evidence supports KU's interpretation of the Facilities Charge Fund payment calculation.

First, OMU's bond offering documents specifically state that the Facilities Charge Fund payments should be calculated using the Article III, Section 3(d) formula. Specifically, the 1991 Prospectus states that KU's monthly Facilities Charge Fund payments should be equal to "$2.03 per kilowatt allocated to Kentucky Utilities for purposes of calculating capacity costs." (1991-B Series Bonds, pp. 21-22.) The bond documents then go on to specifically cross-reference the prospectus provisions describing the Article III, Section 3(d) formula for allocating capacity costs. As KU points out, these bond documents were drafted

contemporaneously with the 1991 Amendment, certified for accuracy by OMU's attorneys, and drafted for the specific purpose of describing the parties' financial expectations under the Contract for potential investors.  The only explanation by OMU's witnesses of the bond documents' reference to the Article III, Section 3(d) formula in the Facilities Charge Fund calculation is merely that the bond document descriptions of the Facilities Charge Fund provision was incorrect.

Second, the annual budget projections OMU provided to KU between 1995 and 1998 also demonstrate that both parties consistently used the Article III, Section 3(d) formula to calculate Facilities Charge Fund payments.  In each of these budgets, OMU calculated KU's Facilities Charge Fund payments using the capacity allocations prescribed by the Article III, Section 3(d) formula.  (June 16, 1995, J. Grise Letter, August 2, 1996, J. Grise Letter; July 2, 1998, K. Roberts fax.)  See also May 6, 1997 Budget Projection.  The fact that the parties were making this calculation confirms KU's interpretation of the Facilities Charge Fund clause payment calculation.

Finally, the Court finds persuasive the deposition testimony of Jim Tipton, KU's principal negotiator during the 1991 negotiations and later a paid OMU litigation consultant, in which he testified that KU had always understood the term "capacity allocations" in the Facilities Charge Fund provision to refer to the same capacity allocations prescribed by Article III, Section 3(d) of the 1960 Contract.  (Tipton Deposition at 50-54.)

For these reasons, the Court finds that all the extrinsic evidence of the parties' intent concerning the 1991 Amendment supports the conclusion that the parties believed the phrase

"capacity allocations" would be defined in the same manner in the Facilities Charge Fund provision that it had been in the 1960 Contract and subsequent amendments.  Thus, the Court grants KU's motion for partial summary judgment on the Facilities Charge Fund issue and denies OMU's motion for partial summary judgment.

## IV.  GREEN RIVER CLAUSE

The parties have filed cross motions for summary judgment requesting the Court to grant a partial summary judgment and declaratory judgment upholding their respective interpretations of the Green River Clause found in Article III, Section 2 of the 1960 Contract [DN 315, DN 296].

### A.  Green River Clause

Article III, Section 2 allocates the parties' respective rights to take power generated from the Elmer Smith Generating Station.  Pursuant to the first sentence of Article III, Section 2, OMU is entitled "to take such part of the capacity and electric energy output of Station 2 as it elects to take to supply the City, its inhabitants and other ultimate consumers in its service area . . . with the heat, light and power . . . ." (1960 Contract, Article III, Section 2.)  In other words, OMU is granted the right to take the amount of energy output at ESGS required to serve OMU's "ultimate consumers in its service area," which is sometimes referred to as its native load.  Pursuant to Section 2, KU is entitled to take all the energy generated at OMU in excess of OMU's native load. (Id.)  The only exception to the allocation of energy outlined above is the second sentence of Article III, Section 2 – the Green River Clause – which provides: "Nothing herein contained shall prevent the

13

Commission from including in its load to be taken from this Station the load that is required by the Green River Rural Electric Cooperative Corporation for sale to its ultimate consumers and any normal increase of the Cooperative's load."  (Id.)

### B.  Background

Under a 1956 Contract between OMU and Green River Rural Electric, OMU sold energy to Green River Rural Electric and those sales were ongoing at the time the Power Supply Contract between OMU and KU was entered into in 1960.  Green River canceled the 1956 contract with OMU in January 1962.  It is undisputed that OMU has not sold power to Green River since the cancellation of that contract.  In June of 1999, Green River Rural Electric and Henderson Union Electric Cooperative Corporation consolidated into a new entity named Kenergy Corporation.  As a result, Green River no longer exists.  Kenergy is a member of the Big Rivers Electric Cooperative.  The contract between Kenergy and Big Rivers obligates Kenergy to purchase all of its energy requirements from Big Rivers.

### C.  Discussion

In its Amended Complaint, OMU asks the Court to declare that the Green River Clause should be interpreted in three alternative ways: (1) that "OMU is entitled to use the load that would be required by Kenergy to serve its ultimate consumers who are within the former service area of [Green River] for any purpose;" (2) that OMU may "supply power to another for delivery to the ultimate consumers of Kenergy;" and (3) that "OMU may supply power directly to Kenergy."  (Amended Complaint ¶ 37(c) [DN 211].)  On the other hand, KU argues that under the clear and unambiguous language of the Green River Clause, OMU

is only permitted to sell energy to Green River for use by Green River to sell to its customers in its service area.  KU maintains that there is no support in the Contract's plain terms for OMU's present interpretation.

As discussed above, "[i]n construing a contract, a court's primary objective is to ascertain and to effectuate the intention of the parties to the contract from the contract itself." Logan Fabricom, Inc. v. AOP Partnership LLP, 2006 WL 3759412, *2 (Ky. App. December 22, 2006).   In the absence of ambiguity, a written instrument will be enforced strictly according to its terms, and a court will interpret a contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence.  Frear v. P.T.A. Industries, Inc., 103 S.W.3d 99, 106 (Ky. 2003).  The Court finds the Green River Clause is not ambiguous. Therefore, the Contract will be interpreted by the ordinary meaning of its terms.

The clear and unambiguous language of the Green River Clause does not permit OMU to take the power equivalent to the amount of power that would be required to serve the consumers of the former Green River Rural Electric Cooperative and sell that power in the open market to anyone.  Likewise, the Court finds that the language in Green River Clause does not permit OMU to sell directly to Kenergy, as Green River's successor-in-interest, or to sell to an intermediary, such as Big Rivers, for the sale to Green River's ultimate consumers.

First, the Green River Clause clearly permits OMU to include in its load to be taken from the ESGS station "the load that **is required** by the Green River Rural Electric Cooperative Corporation **for sale to its ultimate consumers** . . . ." (1960 Contract, Article

15

III, § 2 (emphasis added).)  The language permits OMU to sell energy only to Green River and only for Green River to sell to its consumers in its service area.  Contrary to OMU's assertion, this language cannot be interpreted reasonably to permit OMU to take an amount of energy equivalent to "the load that is required by Green River" for sale in the open market or to Kenergy or Big Rivers for that matter.  The Green River Clause merely permits OMU to continue selling energy to Green River for sale to Green River's ultimate consumers. OMU currently has no contract with Green River.  In fact, Green River no longer exists. Therefore, OMU is not entitled to take any additional energy output from ESGS pursuant to the Green River Clause.

Second, the fact that Kenergy may be the successor-in-interest to Green River pursuant to the Consolidation Agreement between Green River Rural Electric Cooperative and Henderson Union Electric Cooperative does not alter the plain language of the Green River Clause.  OMU points out that the Consolidation Agreement effectuating the consolidation of Green River Rural Electric and Henderson Union Electric  into Kenergy provided that all of Green River's rights and interests transferred to and vested in Kenergy and would not revert or be impaired by the merger.  OMU argues that Kenergy is the successor by merger to Green River and is vested with the unimpaired rights of Green River. Based on the Consolidation Agreement, OMU maintains that Green River's merger or consolidation into Kenergy did not nullify the right of OMU to exercise its rights under Section 2 of Article III because Kenergy stepped into the shoes of Green River.

The Court acknowledges that Kenergy may be a successor-in-interest to Green River's

16

rights; however, Green River has no rights under that contract.   The Green River Clause confers rights only upon OMU.   Green River is not a party to the 1960 Contract. Furthermore, if the intention of the parties had been to permit OMU to include in its load the load that is required by Green River or *its successor-in-interest*, the language in Section 2 should have clearly stated such.  Instead, the contract specifically identifies Green River as the only exception to OMU's rights to take power solely to serve the City's needs and its ultimate customers in its service area.   Given the clear language of the Contract, Green River's status as a real entity capable of purchasing power is a prerequisite to OMU's ability to include in its load energy to serve Green River's ultimate consumers.   Since that prerequisite is no longer met, OMU is not entitled to include in its load any power to serve Kenergy or Kenergy's ultimate consumers within the former Green River service area.

For these reasons, KU's motion for summary judgment on the Green River Clause issue is granted and OMU's motion for summary judgment on the Green River Clause issue is denied.  Further, KU's motion for oral argument is denied.

## V.  NOx EMISSION ALLOWANCE ISSUE

The parties have filed separate cross motions for summary judgment and supporting memoranda of law concerning the nitrogen oxides ("NOx") emission allowance issue [DN 316, DN 310].   In support of its motion, KU seeks to rely upon the expert report of its proffered expert witness, Mr. Thomas A. Hewson, Jr.  OMU has separately moved to exclude Mr. Hewson's testimony at trial and preclude the evidentiary use of his report [DN 314].

17

## A.  Background

The 1990 Clean Air Act Amendments established an emission allowance program designed to reduce harmful emissions and byproducts from electrical generation, including nitrogen oxides.  See 42 U.S.C. §§ 7651c, 7651d. The Act requires owners or operators of fossil fuel-fired combustion devices to obtain emissions permits from the EPA for each location.  See 42 U.S.C. § 7651g.  In the Act, emission allowances for these nitrogen oxides ("NOx") are allocated to plants that generate electrical power based upon their historical emissions levels.  A NOx emission allowance is an authorization to emit one ton of NOx during a control period.  States are responsible for allocating allowances to specific generating units operating within the state's borders and these allowances are given at no cost. The Act provides that these emissions allowances may be bought and sold as any other commodity.  See 42 U.S.C. § 7651b(b); 101 Cong. Rec. S16980 (daily ed. October 27, 1990)(statement of Sen. Moynihan)("[A]llowances will be treated in part like economic commodities").

If a unit's emissions are reduced below the number of allowances held in the utility's account, the remaining unused allowances allocated to that unit may be used elsewhere in the owner's system or sold to third parties at open market prices.  If a unit's emissions exceed the number of allowances assigned to that unit, additional allowances must be utilized to avoid sanctions under federal law.  These can either be excess allowances from elsewhere in the utility's system or they may be purchased on the open market.  "The transferability of allowances in a market setting is expected to create incentives for aggressive and innovative

18

efforts to control pollution." <u>Ormet Primary Aluminum Corp. v. Ohio Power Co.</u>, 207 F.3d 687, 689-690 (4th Cir. 2000).

Under state and federal law, joint owners of an electric generating unit ratably share in the NOx emission allowances.  "Joint ownership is defined to encompass several types of relationships, including multiple holders of title to an affected unit, lessors and lessees of an affected unit, and situations 'where a utility or industrial customer purchases power from an affected unit (or units) under life-of-the-unit, firm power contractual arrangements.'" <u>Ormet</u>, 207 F.3d at 690 (citing 42 U.S.C. § 7651g(i)).  A life-of-the-unit arrangement is specifically defined in the Act and will be discussed below. See 42 U.S.C. § 7651a(27).

In the present case, OMU contends that it is the "owner of all NOx allowances allocated to the units at Station 2 under the provisions of 42 U.S.C. 7651g(i) and 42 U.S.C. 7651a(27) and all other applicable law." (Amended Complaint at ¶¶ 33, 37(g) [DN 211].) KU contends the 1960 Power Supply Contract meets the federal and state regulatory definitions for a "life-of-the-unit" contract, and thus KU is entitled to its proportional share of the assigned ESGS NOx emission allowances.  KU contends alternatively that, in any event, there is no provision in the Contract that permits OMU to charge KU for emission allowances that ESGS received for free.

### B.   Life-Of-The-Unit Contract

Pursuant to the 1990 Clean Air Act, utilities that are a party to a "life-of-the-unit, firm power contractual arrangement" are entitled to their proportional share of NOx allowances assigned to that generating unit.  42 U.S.C. § 7651g(i).  The Act defines such an arrangement

19

as follows:

> The term "life-of-the-unit, firm power contractual arrangement" means a unit participation power sales agreement under which a utility or industrial customer reserves, or is entitled to receive, a specified amount or percentage of capacity and associated energy generated by a specified generating unit (or units) and pays its proportional amount of such unit's total costs, pursuant to a contract either-
>> (A) for the life of the unit;
>> (B) for a cumulative term of no less than 30 years, including contracts that permit an election for early termination; or
>> (C) for a period equal to or greater than 25 years or 70 percent of the economic useful life of the unit determined as of the time the unit was built, with option rights to purchase or re-lease some portion of the capacity and associated energy generated by the unit (or units) at the end of the period.

42 U.S.C. § 7651a(27).

In <u>Ormet Primary Aluminum Corp. v. Ohio Power Co.</u>, 207 F.3d 687 (4th Cir. 2000), the Fourth Circuit summarized the statutory definition of "life-of-the-unit, firm power contractual arrangement" as follows:

> This definition can be distilled into four elements, all of which a power sales agreement must satisfy in order for the customer to be considered a joint owner under the Act: (1) the customer must have reserved or been entitled to receive a specified amount or percentage of capacity and associated energy; (2) the energy must be generated by a specified generating unit or units; (3) the agreement must require the customer to pay "its proportional amount" of the total costs of the specified unit or units; and (4) the arrangement must be for a substantial length of time relative to the life of the unit, as specified in the Act. Thus, the Act recognizes joint ownership only where a power sales agreement provides for both a firm reservation of electrical power from a specific unit and a proportionate division of the operating costs of that unit. On the other hand, to the extent that such an agreement guarantees a customer's power requirements from any source, without imposing on that customer the risk of loss of that power from a particular unit, joint ownership is contraindicated.

Id. at 690.  OMU concedes that KU has satisfied two of the four elements, the durational requirement and the unit specificity restriction.  However, OMU argues that the 1960 Contract does not constitute a life-of-the-unit contract because KU is not "entitled to receive a specified amount or percentage of [ESGS] capacity and associated energy," nor is KU required to pay "its 'proportional amount' of the total cost of [the ESGS] units." Ormet, 207 F.3d at 690.

### 1.  Specified Amount or Percentage of Capacity and Associated Energy

The first requirement is that under the 1960 Power Supply Contract, KU must have reserved or been entitled to receive a "specified amount or percentage of capacity and associated energy." 42 U.S.C. § 7651a(27).

### a.  Argument

OMU argues that KU's entitlement to any remaining capacity and energy does not constitute a "specified amount or percentage" of ESGS capacity and associated energy. OMU contends that (i) the words "specified amount" mean a stated numerical megawatt entitlement in unit capacity and associated energy; and (ii) the word "percentage" (or "specified . . . percentage") means a stated numerical percentage share of unit capacity and associated energy.  According to OMU, this gives meaning to all of the words of the statute. Given that KU is not entitled to any stated numerical amount or percentage of plant capacity and energy, OMU argues that KU fails to satisfy this requirement.

KU argues that Article III, Sections 2 and 3 of the Contract indisputably allocate to KU a specified amount of the capacity and associated energy of ESGS.  Article III, Section

21

2 of the Contract provides that "any surplus capacity and electric energy . . . remaining" after OMU takes that electricity necessary to meet OMU's native load requirements shall be available to KU.  KU points out that Article III, Section 3(d)(5) calculates "[t]he capacity of Station 2 allocated for use by" OMU arithmetically as OMU's peak megawatt demand during the preceding 12 months, plus a 15% reserve margin factor adder.  Likewise, Article III, Section 3(d)(6) specifies that: "The capacity of Station 2 allocated to the Company shall be the difference between the established capacity of Station 2 and the capacity allocated for use by the Commission."  KU argues that Congress did not require a life-of-the-unit contract to provide a stated "numerical" amount or percentage of capacity and energy as advanced by OMU.  Instead, KU contends that Article III, Section 2's contractual entitlement to any remaining ESGS "surplus capacity and electric energy" constitutes a specified amount of capacity and associated energy within the meaning of the statute.

*b.  Discussion*

Article III, Section 2 of the 1960 Contract provides that OMU is entitled to use as much of ESGS' capacity and energy output as it needs to serve the City, its inhabitants, and other consumers in its service area, and KU is allocated the remainder of the energy. Specifically, Article III, Section 2 provides:

> Section 2.  Allocation of Capacity and Electricity Energy from Station 2.  The Commission shall have the right to take such part of the capacity and electric energy output of Station 2 as it elects to take to supply the City, its inhabitants and other ultimate consumers in its service area, as hereinafter defined in Article VII, with heat, light and power and any surplus capacity and electric energy then remaining shall be available to the Company.  Nothing herein contained shall prevent the Commission from including in its load to be taken

22

> from this Station the load that is required by Green River Rural Electric
> Cooperative Corporation for sale to its ultimate consumers and any normal
> increase of the Cooperative's load.

(1960 Contract, Article III, Section 2.)  Therefore, the ultimate question is whether the

allocation of  "surplus capacity and electric energy then remaining" qualifies as a reservation

of a "specified amount or percentage of capacity and associated energy" pursuant to the life-

of-the-unit contract definition contained in 42 U.S.C. § 7651a(27).  The Court concludes that

it does.

Article III, Section 2 of the Contract allocates to KU a specified portion or amount of

the capacity and associated energy of ESGS.  While OMU contends that KU does not satisfy

the first requirement because KU is not entitled to any stated numerical amount or percentage

of plant capacity and energy, the Court finds that Congress did not require a life-of-the-unit

contract to provide a "stated numerical amount or percentage" of capacity and energy.

Instead, the plain language of the statute requires a "specified amount or percentage of

capacity and associated energy."  42 U.S.C. § 7651a(27).  The substitution of the words

"stated numerical" for the word "specified" as advanced by OMU essentially rewrites the

statute.

"When a word is not defined by statute, we normally construe it in accord with its

ordinary and natural meaning." Smith v. United States, 508 U.S. 223, 228 (1993).  The Court

finds that the ordinary or natural meaning of "specified amount" is not synonymous with

"stated numerical amount."  "Specified" means "to name or state explicitly or in detail."

*American Heritage Dictionary* (3d ed. 1999).  None of the definitions of "specified" cited

23

to the Court state that to be "specified" an amount must be "stated numerically." Furthermore, OMU argues that the dictionary definition of "amount" can only mean a number or sum. However, "amount" is also defined as a "quantity; measure." Id. Clearly, giving "specified" and "amount" their ordinary and natural meaning, KU is entitled under the Contract to a "specified quantity" of energy and capacity. The Contract states "explicitly" and "in detail" the amount of capacity and energy to which KU is entitled – the "surplus capacity and electric energy then remaining." Additionally, Article III, Section 3(d)(5) calculates arithmetically the percentage of the capacity of the ESGS allocated for use by OMU each month. Article III, Section 3(d)(6) then specifies that the remaining capacity of ESGS is allocated to KU.

For these reasons, the Court finds that the 1960 Contract satisfies the first element of the life-of-the-unit contract definition.

### 2. *Proportional Amount of Units' Total Costs*

To fulfill the third statutory requirement for establishing a life-of-the-unit contract, KU must demonstrate that the 1960 Contract requires it to pay a "proportional amount of the [ESGS units'] total costs." 42 U.S.C. § 7651a(27).

### a. *Arguments*

OMU argues that KU has not paid, and does not pay its "proportional amount" of the plant's costs for the surplus capacity and energy it has purchased and continues to receive from ESGS. OMU argues pursuant to 42 U.S.C. § 7651a(27), a contractual purchaser must bear responsibility for total plant costs proportional to the amount of capacity and energy

which it purchases.  Instead, under the contract OMU always pays capacity costs 15 to 20 percent higher than its maximum usage pursuant to Article III, Section 3(d)(5).  As set forth in the 1960 Contract, "[t]he capacity of Station 2 allocated for use by the Commission in any one month shall be the highest 60-minute integrated kilowatt demand in such month, *plus 15%*, which the Commission imposes on the 69KV level of Station 2."  (Article III, Section 3(d)(5)(emphasis added)).  Given this language in the Contract, OMU maintains that KU does not pay its proportional share of the costs of the surplus capacity it is actually entitled to purchase under the parties' agreement.

KU argues that the "proportional amount" requirement is demonstrated when "the percentage of plant capacity reserved by the customer corresponds to the percentage of costs born by that customer."  <u>Ormet</u>, 207 F.3d at 692.  KU contends that Article III, § 3(a) allocates ESGS's capacity costs between OMU and KU on a monthly basis using the amount of generating capacity allocated to each party.  These capacity cost allocations include payments towards the bonds used to finance construction of ESGS and installation of pollution abatement technology, all costs associated with operations, payment for administrative and general expenses, and other "capacity costs."  Similarly, under Article III, § 3(b), ESGS's energy costs, such as fuel, maintenance and labor, are divided between the parties "on the basis of the number of net kilowatt hours of energy used by each party from Station 2."  (1960 Contract, Article III, § 3(b).)  As to all other costs incurred by ESGS and not specified in express provisions of the Contract, Article III, § 3(c) of the parties' agreement provides for the allocation of those costs on a capacity basis.  Accordingly, given

this language, KU maintains that the 1960 Contract requires it to share in the costs of the unit in proportion to its allocated or reserved capacity and energy.

### b. Discussion

The statutory provision for establishing a life-of-the-unit contract requires in part that the power customer "reserves, or is entitled to receive, a specified amount or percentage of capacity and associated energy generated by a specified generating unit (or units) and pays its proportional amount of such unit's total costs." 42 U.S.C. § 7651a(27).   See also Ormet, 207 F.3d at 692.   In interpreting the "proportional amount"  provision, the Fourth Circuit in Ormet held that:

> Because these statutory criteria are intended to define a shared ownership, the provisions make sense only if the percentage of plant capacity reserved by the customer corresponds to the percentage of costs born by that customer.  If two parties divided the entitlement to a plant's capacity 50-50, it would hardly be indicative of ownership if one party bore only 5% of the plant's costs. The grammatical structure of this enactment confirms our interpretation.  It requires that the customer *reserve a specified amount or percentage* of a plant's capacity and *pay "its proportional amount"* of the plant's costs.   The antecedent for "proportional amount" is the reserved "amount or percentage of capacity."  If this were not so, then any proportional amount would suffice, undermining the need to use the word "proportional" at all.

Id.  Therefore, in order to satisfy this requirement, KU must be contractually obligated to pay its proportional share of the costs associated with its reserved "amount or percentage of capacity," or stated otherwise, its proportional share of the costs of the amount of capacity that it is "entitled to receive" under the 1960 Contract.  42 U.S.C. § 7651a(27).

After a review of the 1960 Contract in light of 42 U.S.C. § 7651a(27), the Court finds that KU satisfies the "proportional amount" element of the "life-of-the-unit" contract.  Article

III, Section 3 of the Contract allocates all of the costs of ESGS.  All capacity costs of ESGS are allocated "monthly on the basis of the **proportionate amount of generating capacity** allocated for use by each party." (1960 Contract, Article III, § 3(a) (emphasis added).)   As discussed in detail above, Article III, Section 3(d) of the 1960 Contract provides the formula for determining allocated capacity under the Contract and its amendments.  (1960 Contract, Article III, § 3(d)).  Similarly, all of ESGS's energy costs are allocated between the parties "on the basis of the number of net kilowatt hours of energy used by each party from Station 2." (1960 Contract, Article III, § 3(b).)  With respect to all other costs incurred by ESGS and not specified in express provisions of the Contract, Article III, Section 3(c) of the parties' agreement provides for the allocation of those costs on a capacity basis.  (1960 Contract, Article III, § 3(c).)   Thus, under the terms of the 1960 Contract, the "percentage of plant capacity reserved by [KU] corresponds to the percentage of costs born by [KU]." Ormet, 207 F.3d at 692.

The Court rejects OMU's argument that the Contract does not satisfy the "proportional" test because the amount of energy KU takes in a year is not identical to KU's share of the capacity costs during that twelve month period.  As correctly pointed out by KU, the fact that OMU takes less energy under Section 2 than is "allocated for use by" it under Section 3 does not change the fact that capacity costs are exactly proportional to the capacity reserved for use by each party.  See Ormet, 207 F.3d at 692.  Additionally, the Court agrees with KU that the statute does not require the allocation of costs to be identical to the division of energy.  The statute specifically provides that the allocation of a unit's cost must be

27

"proportional" to the "amount or percentage of capacity and associated energy" that KU

"**reserves**, or is entitled to receive . . . ."  42 U.S.C. § 7651a(27)(emphasis added).

Furthermore, with respect to the amount of energy KU actually receives under the Contract,

all "energy costs" are allocated based on the amount of energy taken.

Finally, OMU's reliance on <u>Ormet</u> on this point is not persuasive.  Instead, <u>Ormet</u>

appears to support the position of KU on this issue.  In <u>Ormet</u>, the Fourth Circuit concluded

that the parties in that case were not paying "porportionate" costs because their cost

allocation was "never stated as a function" of the unit's total costs, "did not vary in

proportion to its reservation of energy and did not bear a consistent relation to the total costs

incurred . . . in operating the . . . units." <u>Ormet</u>, 207 F.3d at 693.  On the other hand, under

the 1960 Contract, capacity costs are allocated on the basis of the "proportionate amount of

generating capacity allocated for use by each party" and energy costs are allocated on the

basis of the "net kilowatt hours of energy used" by the parties.  (1960 Contract Art. III,

Section 3(a) and 3(b).)  Clearly, in the present case "the percentage of plant capacity reserved

by [KU] corresponds to the percentage of costs born by [KU]," <u>Ormet</u>, 207 F.3d at 692, and

therefore, satisfies the third element of the life-of-the-unit contract definition.

## C.  Conclusion

For these reasons, the Court concludes that the Contract qualifies as a life-of-the-unit,

firm power contractual arrangement under the governing federal and state regulations.

Accordingly, the motion by KU for partial summary judgment declaring that it is the owner

of a proportionate share of the NOx emission allowances allocated to the Elmer Smith

Generating Station No. 2 and that OMU is not the sole owner of those allowances is granted. The motion by OMU for partial summary judgment on the NOx Emission Allowance issue is denied.

### D.  Expert Testimony of Thomas Hewson, Jr.

OMU moves to exclude the testimony and report of KU's expert, Mr. Thomas A. Hewson, Jr. [DN 314].  According to KU, Mr. Hewson opines that the 1960 Contract satisfies the regulatory requirements for a "life-of-the-unit, firm power contractual arrangement," and accordingly, KU should have rights to its proportionate share of NOx allowances to be used to generate KU's share of energy from the Plant.  Mr. Hewson also proffers two alterative cost allocation practices that would be more consistent with industry practice under the facts of this contract than OMU's current billing practices toward KU, even if the Court determines that the Contract is not a "life-of-the-unit" contract.

The Court interpreted the Clean Air Act and determined as a matter of law that the 1960 Contract is a "life-of-the-unit" contract.  Mr. Hewson's testimony and report on this issue was not considered.  For this reason, the motion by OMU to exclude the expert report and testimony of Mr. Hewson is moot.

### VI.  CONCLUSION

For the reasons set forth above, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1.     The motion by Plaintiffs, OMU and the City, for partial summary judgment on the interpretation of the Facilities Charge Fund Provision of the Contract [DN 295] is

29

**DENIED**.   The motion by Defendant, KU, for partial summary judgment on the interpretation of the Facilities Charge Fund Provision of the Contract [DN 279] is **GRANTED**.

2. The motion by Plaintiffs, OMU and the City, for partial summary judgment on the interpretation of the Green River Clause [DN 315] is **DENIED**.  The motion by Defendant, KU, for partial summary judgment on the interpretation of the Green River Clause [DN 296] is **GRANTED**.  The motion by Defendant, KU, for a hearing on the Green River Clause issue [DN 298] is **DENIED**.

3.  The motion by Plaintiffs, OMU and the City, for partial summary judgment on the NOx Emission Allowance Issue [DN 316] is **DENIED**.  The motion by Defendant, KU, for partial summary judgment on the NOx Emission Allowance Issue [DN 310] is **GRANTED**. The motion by Plaintiffs to exclude the testimony and report of KU's expert, Mr. Thomas Hewson, [DN 314] is **MOOT**.

cc: counsel of record