UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO.: 4:04-CV-87-M

CITY OF OWENSBORO and                                      PLAINTIFFS
CITY UTILITY COMMISSION OF THE CITY
OF OWENSBORO, KENTUCKY, a/k/a
OWENSBORO MUNICIPAL UTILITIES

v.

KENTUCKY UTILITIES COMPANY                                 DEFENDANT


<u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on motions for partial summary judgment by both the

Plaintiffs, City of Owensboro and Owensboro Municipal Utilities ("OMU"), and the

Defendant, Kentucky Utilities Company ("KU").  KU seeks partial summary judgment on

OMU's request that the Court substitute a "proxy" pricing provision for the pricing provision

in the contract [DN 313]; on OMU's claim that back-up energy must be billed to reflect

"available" generation [DN 325]; and on OMU's claims relating to MISO Day Two Charges

[DN 318].  OMU seeks partial summary judgment on KU's counterclaim regarding the

operation and maintenance of the Elmer Smith Generating Station ("ESGS") [DN 322].  On

September 25, 2008, the Court heard oral argument on these motions.  On October 3, 2008,

the Court issued an Order deciding the motions [DN 436].  This Memorandum Opinion sets

forth in more detail the Court's reasoning for its decision.

## I.  SUMMARY JUDGMENT STANDARD

In order to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits, establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact.  Celotex  Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

## II.  OVERVIEW

### A.  Pertinent Contract Provisions

The Plaintiffs and Defendant initially entered into a contract in 1960 to construct an electricity generating facility that would provide both parties with resources for electrical power (the "Contract").  The Contract has been amended several times with the most recent amendment taking place in 1998.

Article VI of the Contract governs the rights and duties of the parties with regards to back-up energy.  The Contract provides that, in the event of an interruption in service from ESGS, KU will provide OMU with such back-up energy "as it [KU] can supply without curtailment of service to its own customers, injury to its equipment, or conflict with its contractual obligations to others not parties to this agreement."  (1960 Agreement, art. VI,

§ 1.)  The Contract provides that when KU supplies OMU with back-up energy, the price of the back-up energy is "the incremental energy cost of the Company's system, as defined in Exhibit 3 hereto, for all energy supplied by Company [KU]."  (Id.)

Exhibit 3 defines "Incremental Energy Cost of the Company's System" for purposes of setting the price that KU may charge OMU for back-up energy.  (1969 Supplemental Agreement, Exhibit 3.)  Exhibit 3 states the formula for the price of on-system back-up power, i.e., power "generated on [KU's] system," as follows:

> The Incremental Energy Cost of the Company's System for a specific delivery of energy generated on the Company's system shall include the Company's incremental fuel expense, incremental operating labor, incremental maintenance expense, a billing charge, transmission losses, and, to the extent applicable, start-up and tax expenses.

(Id.)  The next seven paragraphs of Exhibit 3 define in detail how to calculate the incremental fuel expense, incremental operating labor, incremental maintenance expense, a billing charge, transmission losses, and start-up and tax expenses.

When it is necessary for KU to purchase back-up energy from a third party, i.e. off-system back-up energy, Exhibit 3 provides:

> If the energy requested by the City is not available from the Company's generating facilities, and it is necessary for the Company to purchase the energy in order to make the delivery to the City, in that event the Incremental Energy Cost of the Company's system shall be the actual cost to the Company of such purchased energy, excluding any demand charge, plus 7% for transmission losses.

(Id.)

Article III of the contract governs the rights and duties of the parties related to the

3

operations and maintenance of ESGS as well as certain allocation of costs.  Section 1 of Article III provides as follows:

> The Commission [OMU] will operate and maintain Station 2 and associated substation facilities in a good and workmanlike manner.  All repairs shall be made with materials and workmanship of a standard at least equal to that which prevailed in the construction of Station 2.

(1960 Agreement, art. III, § 1).

## B.  Contract Interpretation

Many of the issues raised in the parties' motions for summary judgment are governed by the principles of contract interpretation.  The interpretation of a contract is a question of law for the Court to decide.  Equitania Ins. Co. v. Slone & Garrett, P.S.C., 191 S.W.3d 552, 556 (Ky. 2006).  "In construing a contract, a court's primary objective is to ascertain and to effectuate the intention of the parties to the contract from the contract itself."  Logan Fabricom, Inc. v. AOP P'ship, LLP, No. 2004-CA-002410-MR, 2006 WL 3759412, at *2 (Ky. Ct. App. Dec. 22, 2006) (citations omitted).  "[I]n the absence of ambiguity, a written instrument will be enforced strictly according to its terms, and a court will interpret a contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence.  Frear v. P.T.A. Indus., Inc., 103 S.W.3d 99, 106 (Ky. 2003) (quotation and citation omitted).

"[I]t is not the function of this Court to change obligations of a contract which the parties have made, . . ., nor to add a condition which was not written into the contract."  White v. Winchester Land Dev. Corp., 584 S.W.2d 56, 64 (Ky. Ct. App. 1979).  "The general

4

rule is that a party to a contract will not be relieved of the obligations undertaken by him merely because supervening events have rendered the contract unprofitable, even though the supervening event be a law, regulation or other governmental act." Bustop Shelters, Inc. v. Classic Homes, Inc., No. 88-5464, 1990 WL 47564, at *6 (6th Cir. Apr. 17, 1990) (citing Frazier v. Collins, 187 S.W.2d 816, 817-818 (Ky. 1945)). "It is only where the governmental act makes unlawful the obligation assumed under a contract, prohibits its performance or otherwise renders performance impossible that the obligor will be excused from further performance." Id.

However, "[i]t is generally recognized that if a contract is silent on a certain point, the law will imply an obligation to carry out the purpose for which the contract was made . . . . Terms are implied in a contract to give the contract the effect the parties would have agreed on if they would have considered the possibility of subsequent events." Old Republic Ins. Co. v. Ashley, 722 S.W.2d 55, 58 (Ky. Ct. App. 1986) (citations omitted). See also Ranier v. Mount Sterling Nat'l Bank, 812 S.W.2d 154, 156 (Ky. 1991)("[W]hen a contract is silent with respect to a matter vital to the rights of the parties, a court, in construing it, is necessarily compelled to resort to a consideration of the surrounding circumstances and the conduct of the participants indicating their interpretations.") (quotation omitted); Richardson v. Eastland, Inc., 660 S.W.2d 7, 8 (Ky. 1983)("Where the contract is silent we must interpret the intent of the parties."); Bank of N.Y. v. Janowick, 470 F.3d 264, 271-272 (6th Cir. 2006) (same).

## III.  PROXY PRICING AND AVAILABILITY ISSUES

KU moves for summary judgment on OMU's request that the Court substitute a "proxy" pricing provision for the pricing provision in the contract [DN 313] and on OMU's claim that back-up energy must be billed to reflect "available" generation [DN 325].

### A.  KU's Pricing for Back-up Energy

According to KU, when there is sufficient generation on KU's own system to meet OMU's back-up power demand in a given hour, KU bills OMU based on the incremental cost of producing the power on the KU generating unit that provided the power to OMU, based on the factors set forth in the first paragraph of Exhibit 3.  When sufficient energy is not "available" on KU's system to provide back-up energy to OMU, KU is required to purchase back-up energy from a third party.  KU charges OMU the actual cost KU paid the seller for the energy purchase (plus 7% for transmission losses), excluding any demand charge expressly stated by the seller.  If KU did not pay a separately stated demand charge in connection with the purchase, it charges OMU the entire purchase price that KU paid the seller for the energy (plus 7%).

### B.  OMU's Proposed Proxy Pricing for Back-up Energy

OMU argues that changes in the marketplace and changes in the governmental regulation of the marketplace have caused it to be charged for back-up power "at price levels never contemplated by the Parties' reasonable expectations when they entered the Contract." (Am. Compl. ¶ 26)  According to OMU, at the time the parties entered into the Contract, KU's generating resources consisted mostly of coal-fired units with low energy costs which

were comparable to the costs of energy produced at ESGS.  The parties expected that each party would provide lost-cost, coal-fired energy to the other.  (Id. ¶ 19.)  Additionally, OMU argues that when it and KU entered into the Contract, wholesale electricity was customarily bought and sold at cost-based prices where the capacity/demand charges and energy charges were stated separately.  OMU argues that the Contract contemplated this manner of pricing.  (Id. ¶ 20.) According to OMU, following deregulation, wholesale electricity is now traded under a regimen of market-based prices, where demand charges and energy charges are typically not stated separately.  Instead, suppliers sell at all-inclusive prices that are expressed in dollars per kilowatt hour and the incremental energy cost to generate the energy is not disclosed.  (Id. ¶ 21.)

OMU requests that the Court construe the pricing provisions for both on-system and off-system back-up energy set forth in Exhibit 3 to the Contract as if it contained a "proxy" pricing provision.  Under OMU's suggested proxy method, the price KU could charge OMU for back-up energy would be capped at the incremental cost KU would have incurred if it had generated the energy from the highest cost, coal-fired generating unit on KU's system.  (Paul Reising Expert Report at 41.)  OMU maintains that its proposed proxy price is more consistent with "the fundamental purposes and objectives of the Contract." (Am. Compl. ¶ 26; see also Am. Compl. ¶¶ 27, 37(a),(b).)

## C.  Availability of Energy on KU's System

KU follows an "economic dispatch" approach when dispatching its generating units to serve demand for electricity for its retail customers and wholesale customers like OMU.

According to KU, "economic dispatch" refers to a dispatch model that minimizes cost by dispatching the lowest-cost generating units first, subject to system-reliability constraints such as the need to avoid overloading transmission lines and the need to maintain appropriate voltage control for reliability. (KU Mem. in Support of Motion for Summary Judgment on Availability Issue [DN 325] at 4; Mark Chupka Expert Report at 11-12.)  After energy has been delivered to customers through the dispatch process, KU uses a software system called After-the-Fact Billing ("AFB") to allocate to customers the cost of the generating resources actually used. (Gary Hawley Dep. 29:8-18, Aug. 2, 2007.)  The AFB System assigns generating resources to consumers based on a priority stacking system.  When KU provides OMU back-up energy in a given hour, KU's AFB program allocates the lowest-cost generation that was run in that hour to the KU/LG&E native load and then allocates the next lowest-cost resources for billing to OMU.  (Lynn Coles Expert Report at 11.)[1]

OMU argues that KU breached the Contract by pricing on-system back-up energy according to the cost of the resources actually used to generate energy for OMU, rather than lower cost unused KU resources reported as "available" in the Generator Availability Data System ("GADS").  OMU also argues that KU breached the contract by delivering off-system back-up energy to OMU rather than lower cost unused KU resources also reported as "available" in GADS.  The "availability" reported in GADS is a measure of the maximum

---

[1]      KU correctly points out that OMU does not challenge its position in the priority "stack."  Likewise, OMU does not dispute that the AFB system operated as it was designed allocating generating resources according to this priority.

operating capacity of a unit.  According to OMU, based on the GADS data report, less expensive generation was available for many of the hours when KU provided back-up energy for ESGS, and these units should have been used to determine charges to OMU for back-up energy. (See Am. Compl. ¶ 37a.).

### D.  Discussion

#### 1.  On-System Back-up Energy

OMU seeks to place a cap on the incremental costs which KU may pass through to OMU for on-system back-up energy.  OMU maintains that it does not seek modification of the contract language; it seeks to preserve the intent of the Contract language by giving the Contract the effect the Parties would have agreed on if they had considered the possibility of subsequent events.  See Beech Creek Coal Co. v. Jones, 262 S.W.2d 174, 176 (Ky. 1953). OMU contends that the parties originally anticipated that KU would continue to rely primarily on coal-based generation.  According to OMU, the Contract does not address how "incremental energy cost" on KU's system should be determined if KU decides to include higher-priced non-coal fired units in its supply of generating resources. Thus, OMU argues that KU's failure to replace or add coal-fired capacity to its system and its reliance instead on low-cost capacity and high-cost energy from combustion turbines requires the Court to use a "proxy" method or "gap-filler" to calculate on-system backup energy in order to effectuate the intentions of the Parties.

Upon reviewing the 1960 Contract and 1969 Amendments, the Court finds that the Contract between OMU and KU is not silent on the price of back-up energy.  There is no

9

"gap" in the pricing provisions for on-system back-up energy in Exhibit 3 of the Contract. Exhibit 3 clearly sets forth the pricing formula for calculating the price of on-system back-up energy and permits KU to pass through to OMU all of the incremental costs KU incurs in generating back-up energy on KU's own system.  Nothing in the terms of the Contract imposes any obligation on KU to use any particular kind of generation to provide back-up energy to OMU.  As discussed above,"it is not the function of this Court to change obligations of a contract which the parties have made, . . ., nor to add a condition which was not written into the contract.  White, 584 S.W.2d at 64.  See also  Frazier, 187 S.W.2d at 817 ("[A] party to a contract will not be relieved of the obligations undertaken by him merely because supervening events have rendered the contract unprofitable . . . .").

Furthermore, the Court will not employ the implied covenant of good faith and fair dealing to recalculate the price of on-system back-up energy.  The imposition of the cap upon the pricing formula for on-system back-up energy advocated by OMU does not interpret or construe the contract, but instead attempts to reform the pricing provisions of the contract. "The obligation of good faith cannot be employed, in interpreting a contract, to override express contract terms."  Cooks v. Little Caesar Enters., Inc., 210 F.3d 653, 657 (6th Cir. 2000) (citation omitted).  See also Tenn. Valley Auth. v. Exxon Nuclear Co., 753 F.2d 493, 497 (6th Cir. 1985)("It is well established that a court cannot add an implied contract term that is inconsistent with an express contract.") (citations omitted).    For these reasons, the Court finds in favor of KU on the proxy pricing issue related to on-system back-up energy.

10

### 2. Off-System Back-up Energy

With respect to off-system back-up energy, KU is permitted to recover from OMU "the actual cost to the Company of such purchased energy, excluding any demand charge." OMU contends that at the time of formation of the original contract, energy was sold at a two-part, cost based price in which there was an energy charge and a demand charge. An "energy charge" being that portion of the charge for electric service based upon the electric energy consumed or billed. Since deregulation of the industry, wholesale energy is increasingly sold at a one-part, market-based price. Because the contract did not contemplate a market-based pricing system, OMU maintains that the contract is silent and that the Court should fill the "gap" by adopting the proxy pricing advanced by its expert, Paul Reising. The Court finds, however, that the contract is not silent on the price for off-system back-up energy. The contract clearly sets forth what KU can pass through to OMU, i.e. "the actual cost to the Company of such purchased energy" and "7% for transmission losses," and what KU must exclude from the incremental energy cost, i.e. "any demand charge." Contrary to OMU's argument, there is no gap in the contract.

OMU also contends that there is a genuine issue of material fact regarding the definition of "demand charge" and regarding whether the price KU charges OMU for off-system energy contains a demand charge. According to OMU, Mr. Reising will testify that there are two definitions of the term "demand charge" in the industry. One definition is that a demand charge is a payment by a company under a long-term contract to reserve capacity on a third-party's system. The second type of demand charge involves a charge by third

11

party sellers who aren't paid a demand charge in advance to reserve capacity, but when they are asked to provide energy, they impose a demand charge to cover their fixed costs.  Mr. Reising will also testify that:

> Under such market-based pricing arrangements, charges for services provided are almost exclusively one-part, energy-only prices with no explicitly stated demand charge.  The fact that services are billed on the basis of market-based prices does not mean, however, that the supplier is not recovering fixed costs that historically would have been collected through explicit demand charges.

(Paul Reising Expert Report at 37-38.  <u>See also</u> Mem. from Greg Basheda, June 29, 2007, at 6.)  Additionally, Mr. Reising will testify that the short-term purchases which comprise the off-system back-up energy purchased by KU for OMU are

> market-based, not cost-based, with the result that prices paid for such energy are often substantially above the actual incremental cost of producing that energy and include substantial contributions to recovery of fixed costs which historically (and at the time the Contract was executed, supplemented and amended) would have been recovered through separately stated demand charges and not eligible for pass-through to OMU.

(Paul Reising Rebuttal Report at 5.).

Mr. Reising's testimony, however, does not create a genuine issue of material fact. The Court agrees with Mr. Reising insofar as he asserts that, under the market-based pricing system, a wholesale seller of energy recovers in its one-unit price the costs that traditionally would have been recovered as a separately stated demand charge.  However, the Court finds that whether a "demand charge" is to recover for the capacity reserved on another utility's system or whether it is to recover for that other utility's fixed costs is not material. Regardless of which meaning the parties that entered into the contract attached to the term "demand charge," they were referring to the exclusion of demand charges that were

separately stated.     There is no dispute that in 1960 when the contract was formed and 1969 when the pertinent provisions of the contract were amended, a utility paid for reserved capacity on another utility's generating system by paying an energy charge for energy actually taken and a separately stated demand charge.  As Mr. Reising acknowledges, in today's market-based pricing system it would be impossible to determine what portion of the amount KU passed through to OMU for off-system energy was to recover for fixed costs. Additionally, to impose a proxy price as requested by OMU would require KU ratepayers to cover the cost of energy above the proxy cap whenever KU needs to provide backup energy to OMU because of an interruption as ESGS.  Since there is no demand charge, under the clear terms of the Contract there is nothing to exclude from the actual cost of the purchased energy.

The Court recognizes that deregulation of the energy market has altered the way energy is bought and sold.  "The general rule is that a party to a contract will not be relieved of the obligations undertaken by him merely because supervening events have rendered the contract unprofitable, even though the supervening event be a law, regulation or other governmental act."  Bustop Shelters, 1990 WL 47564, at *6 (citation omitted).  Thus, a change in the marketplace does not warrant this Court to rewrite the contract in question. The contract excludes explicitly stated demand charges.  Where KU purchases energy that does not include a separately stated demand charge, KU may pass through to OMU the entire cost of the purchased energy. For these reasons, the Court finds that summary judgment in favor of KU is appropriate on the proxy pricing issue related to off-system back-up energy.

### 3. *Availability*

OMU argues that KU breached the contract by pricing back-up energy according to the cost of the resources actually used to generate energy, either on-system or off-system, rather than lower cost unused resources that were "available" on KU's system. However, the Contract affords OMU no right to expect that back-up energy will be billed according to the lowest-cost unused resources "available" on KU's system. Similarly, the Contract does not restrict what kind of resources KU can use from its own system to provide OMU with back-up energy. Exhibit 3 to the Contract clearly defines what KU may bill OMU for both on-system and off-system back-up energy. (1969 Supplemental Agreement, Exhibit 3.). The clear and unambiguous language of Exhibit 3 speaks of cost for on-system back-up energy in terms of energy that is actually "generated" on KU's system and actually "deliver[ed]" to OMU.

The plain language of Exhibit 3 speaks of cost for off-system back-up energy in terms of the "**actual cost** to the Company of such purchased energy, excluding any demand charge . . . ." (Id. (emphasis added).) Furthermore, it states that KU may obtain energy off-system "[i]f the energy requested by the City is not available from the Company's generating facilities . . . ." (Id.) It does not require the use of on-system energy if generating resources are listed as "available" in GADS. The word "available" refers to whether the energy is capable of actually being delivered from KU's own generating facilities. In determining whether energy is available on KU's system, the Contract permits KU to consider whether there would be any "curtailment of service to its own customers, injury to its equipment, or

14

conflict with its contractual obligations to others not parties to this agreement." (1960 Contract, art. VI, § 1.). There is no allegation that KU did not comply with the economic dispatch model or that it did not properly take into account the needs of its own customers, its equipment, or other contractual obligations. GADS availability data does not take into account whether a generating unit is capable of being used to make a particular delivery to OMU under principles of "economic dispatch." (Lynn Coles Dep. 126:23-127:9, Nov. 2, 2007.) Materials from North American Electric Reliability Corporation's GADS Reporting Workshop state that GADS "availability" is "not interested in dispatch requirements or needs by the system." (NERC GADS Data Reporting Workshop Materials.) Thus, the Contract provisions do not support OMU's reliance on the GADS "availability" data.

OMU does not appear able to challenge the business judgment of a single dispatch decision. Therefore, to the extent that the "availability" question is a separate issue, and not just a factor in the proxy pricing analysis, summary judgment is appropriate.

## IV. MISO DAY TWO CHARGES ISSUE

Defendant, Kentucky Utilities Company, moves for summary judgment on OMU's claims that: (1) KU incorrectly billed OMU for the marginal congestion and marginal loss components of the MISO Day Two purchase prices; (2) KU should have billed for MISO Day Two back-up energy purchases based upon the OMU CP Node; and (3) that KU should credit OMU for MISO Make Whole Payments made to KU by MISO. [DN 318.]

The Midwest Independent Transmission System Operator ("MISO") is a non-profit corporation that manages the use of interconnected electricity transmission systems of

transmission-system owners, such as KU, in the Midwest region.  KU was a transmission owner member of MISO from 1996 to September 2006.  Prior to April of 2005, MISO's role was limited to coordinating and facilitating transmission use of the member utilities.  This was known as the Day One Period.  In April 2005, MISO instituted the "Day Two" Market. In the Day Two Market, MISO dispatched the member utilities' generating resources rather than each member utility dispatching its own.  In dispatching resources of the member utilities, MISO operated under a centralized economic dispatch model that considered system reliability needs, as well as production costs, in determining which units to commit or dispatch at a given time period. (See KU Mem. in Support of Motion for Summary Judgment on Miso Issues [DN 318] 5-6; Lynn Coles Expert Report at 3-4).

In the MISO Day Two Market, MISO utilizes an auction or bid-based market system to coordinate dispatch decisions and determine the combination of resources to dispatch to serve the forecasted load.  Generally, each MISO member offers all of its generation into the MISO market at offer prices determined by that member within the parameters set by MISO. Members then forecast their projected demand, and MISO matches the supply to the demand to determine the prices of energy at various pricing locations in the MISO system.  These prices are referred to as Locational Marginal Prices ("LMPs").  (Id. at 6; Coles Report at 3-4) When it is time to generate energy to serve their customers, MISO members "sell" all of their energy into the MISO market and then "buy back" such energy as they need to serve their customers. (Id. at 6-7; Coles Report at 3-4)

16

## A.  Inclusion of the Non-Energy Components of MISO Locational Marginal Prices

KU moves for summary judgment on OMU's claim that KU should not be permitted to include the non-energy components of the MISO Locational Marginal Prices (LMPs) in its charges to OMU for back-up energy.  There are three components of MISO LMPs: an energy component, a marginal congestion component, and a marginal losses component. When KU provided OMU back-up power from a purchase off-system in the MISO Day Two Market, KU charged OMU the MISO LMP price which included all three components. Thus, the issue presented is whether the marginal congestion component and the marginal losses component of the LMP should be excluded from the cost that KU included in its charges to OMU for back-up energy pursuant to Exhibit 3 of the Contract.  OMU argues that KU's pass-through of the marginal congestion component and the marginal losses component, which relate not to the cost of the energy itself, but to the cost of its delivery or transmission, is inconsistent with the plain language of the Contract.  Under OMU's interpretation of the contract, KU should only be compensated for its costs of the *energy*. Thus, OMU argues that KU should be limited to charging OMU for only the marginal energy component of the LMP for the back-up energy purchased.  (See Lynn Coles Supplemental Report at 4.)

KU maintains that the marginal congestion cost component is an adjustment to the LMP price at a given location to reflect costs associated with MISO's need to run higher-cost generating units to relieve congestion on the transmission system and thereby permit lower-cost generation to flow.  The marginal loss component is an adjustment to the LMP price to

reflect losses of energy that occur on the MISO system in the course of delivering energy between the generator that produced the power and KU's system.  Under KU's interpretation of the Contract, these costs are part of its costs for the energy.  KU argues Exhibit 3 of the Contract specifically excludes only "demand charges."  KU maintains that even if the LMP for the off-system energy contains costs unrelated to the generation of energy, those non-energy components are still part of the actual cost to it of such purchased energy.  In other words, KU could not have obtained the energy, but for paying the entire MISO LMP.

The Court disagrees with OMU's interpretation of the contract.  In order to interpret the contract in the manner proposed by OMU the Court would be required to interpret the phrase "the actual cost to the Company of such purchased energy" to mean "the actual cost of the energy alone, exclusive of any other costs associated with the purchase."  This is not what the contract says.  When the contract is read as a whole, it is apparent that the original contracting parties contemplated that the cost to the Company of such purchased energy would or might contain certain non-energy components and that those costs would be passed through to OMU.  If that was not the case, there would be no reason for the parties to explicitly exclude the "demand charge," a non-energy component, from the cost to KU of such purchased energy.  Under MISO, the actual cost to KU of such purchased energy includes the charges for all three components: the energy component, the marginal congestion component, and the marginal losses component.  For these reasons, summary judgment in favor of KU on this issue is appropriate.

### B.  The OMU CPNode Issue and Make Whole Payments

KU seeks summary judgment on the issue of whether it improperly charged OMU for on-system back-up energy based on the pricing at the wrong CPNode and on the issue of whether KU should have reimbursed OMU for Make Whole Payments.  OMU argues that the purpose of Make Whole Payments was to reimburse KU for its incremental energy costs and therefore the savings should have been passed through to OMU.  There are genuine issues of fact regarding each of these claims.  However, KU also sought summary judgment on each of these claims because OMU has failed to prove whether it has been damaged.  In response OMU contends that, to the extent it is seeking damages, those damages can be easily determined in a Court-ordered accounting.  In its prior Order regarding these motions for summary judgment, the Court requested that OMU submit further briefing to discuss why it has an inadequate remedy at law entitling it to an accounting.  The Court will address this issue by separate Order.

### V.  OPERATION AND MAINTENANCE OF ESGS

OMU moves for partial summary judgment on KU's breach of contract counterclaim alleging that OMU failed to operate and maintain ESGS in a good and workmanlike manner [DN 322].

Under the contract, OMU is permitted to use such energy from the two units at ESGS as is needed to supply its native load.  (1960 Agreement, art. III, § 2.)  The contract also provides that KU is entitled to any surplus capacity and electric energy that is remaining after OMU serves its native load at a cost identified in the contract.  (Id.)  Whenever ESGS is

19

interrupted either due to scheduled maintenance or an emergency, not only must KU acquire from other utilities the surplus energy it would have received from ESGS, but it must also supply OMU with all of its energy requirements at KU's incremental energy cost.[2] (Id., art. VI, § 1; see also supra.)  According to the contract, an emergency is an unexpected loss of the ability for OMU or KU to supply its native load with energy from its own resources due to circumstances beyond the control of that utility.  (Id.)  The interruptions that occur at OMU which are most pertinent to KU's counterclaim are forced outages and derates.  A forced outage is an unscheduled outage of either or both of the units at ESGS.  A derate is an unscheduled time when either of the units at ESGS are forced to operate below capacity.

Although the contract does not guarantee that OMU will supply any energy to KU, it does provide that "[t]he Commission [OMU] will operate and maintain Station 2 and associated substation facilities in a good and workmanlike manner."  (Id., art. III, § 1.)  The parties agree that the phrase "good and workmanlike" means:

> the degree of skill, efficiency, and knowledge that is possessed by those of ordinary skill, competency, and standing in the particular trade or business for which the person is employed, and where the contract does not provide for a higher degree of skill, only ordinary skill and the degree of skill adequate to the performance of the undertaking is required.  No breach will be found if the contractor performed the work in accordance with industry standards.

17A Am. Jur. 2d Contracts § 612 (2008) (citations omitted).  KU argues that if ESGS was operated and maintained according to industry standards, it could have acquired more low-

---

[2]   KU claims that the cost of acquiring energy from other resources whenever OMU's supply of energy is interrupted is higher than the low cost energy it can obtain from OMU.

cost energy from ESGS under the contract than ESGS was able to supply.  Instead, KU was forced to go off-system and acquire energy from more expensive resources.

OMU argues that KU, in order to establish that OMU failed to operate and maintain ESGS in a good and workmanlike manner, relies upon a comparison between the equivalent forced outage rate ("EFOR")[3] of ESGS and the average EFOR of like utilities.  OMU argues that EFOR is not a reliable measure of whether a utility is operated and maintained in a good and workmanlike manner and that the testimony of KU's liability expert, Robert Shepard, should be excluded because of his reliance on EFOR.  OMU argues that KU's damages expert, William Abington, should also be excluded because he relied upon EFOR in calculating KU's damages.  OMU asserts Shepard's and Abington's methodologies are flawed.

Although OMU argues that there is a lack of a genuine issue of material fact as to whether it operated and maintained ESGS in a good and workmanlike, the Court disagrees. In forming his expert opinion regarding this matter, KU argues that Mr. Shepard did not rely merely upon EFOR data to establish liability.  Instead, KU asserts that he performed a site visit where he discovered what he determined to be conditions that would not be present in a facility operated and maintained according to industry standards.  (Robert Shepard Expert Report at 5-11.)  KU also asserts that Mr. Shepard reviewed materials that were disclosed in discovery and determined what he believed were deficiencies in certain processes and

---

[3]     EFOR refers to a measurement of the equivalent number of hours a generating unit is forced out of service due to unplanned circumstances.

programs at ESGS.  (Id. at 25-32.)  KU also suggests that Mr. Shepard identified specific outages that he believed were caused by the failure to operate and maintain ESGS according to industry standards.  (Id. at 32-36.)  KU therefore maintains that the use of EFOR data is merely one component in Mr. Shepard's analysis.  The Court has yet to rule as to whether Mr. Shepard qualifies as an expert under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).  Although OMU's expert, Mark McClernon, disagrees with many of the opinions formulated by Mr. Shepard, at this point in the proceedings, these disputes create genuine issues of material fact.  If the Court should later rule at trial that Mr. Shepard's testimony does not meet the standards of Daubert in whole or in part, the Court will not consider such excluded testimony.

The same principles apply to the opinions of Mr. Abington.  KU asserts that Mr. Abington first calculated the number of forced outage hours that would not have occurred at ESGS had it been operated and maintained according to industry standards.  (See William Abington Expert Report at 13.)  KU asserts that Mr. Abington then calculated the difference in price between what KU had to pay for energy from other sources during these forced outage hours and what it would have paid had ESGS been operating properly.  (Id. at 14-16.)  In Mr. Abington's opinion, this amounted to $34,727,710 in damages.  (Id.)  It is also Mr. Abington's opinion that KU suffered $2,196,930 in lost profit damages.  (Id. at 16-17.)  Although Mr. McClernon disputes Mr. Abington's opinions and methodology regarding his calculation of damages, these disputes create genuine issues of material fact.  Just as with Mr. Shepard, the Court has yet to rule as to whether Mr. Abington qualifies as an expert under

22

Daubert.  If the Court should later rule at trial that Mr. Abington's testimony does not meet the standards of Daubert in whole or in part, the Court will not consider such excluded testimony.

As there are genuine issues of material fact regarding whether OMU operated and maintained ESGS in a good and workmanlike manner, summary judgment is not appropriate.

## VI.  MOTIONS TO EXCLUDE EXPERTS

In keeping with the Court's prior Order, [DN 436], all Daubert motions to exclude expert opinion testimony are denied.  [DN 307, 308, 311, 312, 314, 320 and 323].  The Court will hear all expert opinion testimony offered at trial.  The qualifications and methodology can be challenged at trial during cross examination.  After trial, the Court will make appropriate findings concerning the opinion testimony offered by various experts.  Any opinion testimony found lacking will not be considered.  The Court will rule separately on DN 358 and 383, and also on all motions in limine.

## VII.  CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the motions by Defendant, Kentucky Utilities Company, for summary judgment on OMU's request that the Court substitute a "proxy" pricing provision for the pricing provision in the contract [DN 313]; on OMU's claim that back-up energy must be billed to reflect "available" generation [DN 325]; and on OMU's claims relating to the inclusion of non-energy components of MISO Day Two Charges [DN 318] are **granted**; KU's motion on OMU's claim related to the CPNode and Make Whole

23

Payments issues is reserved pending further briefing.

      **IT IS FURTHER ORDERED** that the motion by the Plaintiffs, City of Owensboro and Owensboro Municipal Utilities, for partial summary judgment on Kentucky Utility's counterclaim regarding the operation and maintenance of the Elmer Smith Generating Station [DN 322] is **denied**.

cc: counsel of record