UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:04-CV-87-M

CITY OF OWENSBORO and                                                                PLAINTIFFS
CITY UTILITY COMMISSION OF THE CITY
OF OWENSBORO, KENTUCKY, a/k/a
OWENSBORO MUNICIPAL UTILITIES

V.

KENTUCKY UTILITIES COMPANY                                                          DEFENDANT

**MEMORANDUM OPINION AND ORDER**

The parties entered into Joint Stipulations of Fact addressing certain facts related to back-up energy and NOx allowances [DN 473].  The parties also filed supplemental briefs regarding the amount refundable to KU for NOx Allowances Charges under the terms of the Court's September 5, 2008 Memorandum Opinion and Order  [DN 506, DN 516, DN 519]. The following represents the Court's legal conclusions on the remaining issues related to back-up energy and NOx allowances based on the stipulated facts.

**I.  BACK-UP ENERGY**

In the present case, OMU claimed that KU had improperly billed certain amounts for back-up energy provided by KU to OMU pursuant to the Contract. Based on its objections to KU's back-up energy billings, OMU withheld payment of $4,053,458.32 for amounts KU billed for back-up energy through and including August 2008.  (DN 473, Joint Stipulation ¶1.) In its Amended Complaint, OMU sought a declaratory judgment that "OMU has paid

all amounts payable to KU" for back-up energy. (DN 211, Am. Compl. ¶ 42.) KU's counterclaim, in turn, alleged that OMU had breached the Contract by failing to remit all amounts billed for back-up energy, and sought a judgment awarding KU's damages. (DN 217, Am. Counterclaim ¶17-19, 44, 47.)

In its October 16, 2008 Memorandum Opinion and Order, the Court granted KU's cross-motion for summary judgment rejecting OMU's argument that KU should be required to substitute a "proxy" pricing provision for the pricing provision in the Contract, as well as OMU's claim that KU was required to exclude the marginal congestion and marginal loss components of prices it paid for off-system back-up energy in the MISO Day Two Market. (DN 460.) OMU's only other objections to KU's back-up energy charges relating to certain MISO Day-Two billings were voluntarily dismissed with prejudice on October 20, 2008. (DN 462, DN 464.)

KU is therefore entitled to judgment for damages equal to the total unpaid back-up energy charges owed by OMU of $4,053,458.32 (DN 473, Joint Stipulation ¶ 1). Judgment will therefore be entered in favor of KU and against the Plaintiffs in the amount of $4,053,458.32, together with prejudgment interest at 8% on each past due payment from the date each monthly payment was due until the date of entry of this judgment, and post-judgment interest on the entire amount of the judgment, including interest, at the rate prescribed by 28 U.S.C. 1961 from the date of judgment until paid in full.[1]

---

[1] OMU did not object to KU's proposed judgment regarding the amount of prejudgment or post-judgment interest for the back-up energy damages.

## II. NOx ALLOWANCES

### A. Background

The Court addressed the Clean Air Act's emissions allowance program in its September 5, 2008, Memorandum Opinion and Order. (DN 400.) A brief review of the program is helpful. Under the Clean Air Act, emission allowances for nitrogen oxides ("NOx") are allocated to plants that generate electrical power based upon their historical emissions levels. See 42 U.S.C. §§ 7651c, 7651d. A NOx emission allowance is an authorization to emit one ton of NOx during a control period. States are responsible for allocating allowances to specific generating units operating within the state's borders and these allowances are given at no cost. The Act provides that these emission allowances may be bought and sold as any other commodity. See 42 U.S.C. § 7651b(b); 101 Cong. Rec. S16980 (daily ed. October 27, 1990)(statement of Sen. Moynihan)("[A]llowances will be treated in part like economic commodities"). If a unit's emissions are reduced below the number of allowances held in the utility's account, the remaining unused allowances allocated to that unit may be used elsewhere in the owner's system or sold to third parties at open market prices. If a unit's emissions exceed the number of allowances assigned to that unit, additional allowances must be utilized to avoid sanctions under federal law. These can either be excess allowances from elsewhere in the utility's system or they may be purchased on the open market. See Ormet Primary Aluminum Corp. v. Ohio Power Co., 207 F.3d 687, 689-690 (4th Cir. 2000).

Under state and federal law, joint owners of an electric generating unit ratably share

in the NOx emission allowances. Joint ownership is defined to include situations "'where a utility or industrial customer purchases power from an affected unit (or units) under life-of-the-unit, firm power contractual arrangements.'" Ormet, 207 F.3d at 690 (citing 42 U.S.C. § 7651g(i)). A life-of-the-unit arrangement is specifically defined in the Act. See 42 U.S.C. § 7651a(27).[2]

Beginning with the first NOx-controlled season in 2004, OMU offered KU the alternative each month of either providing NOx allowances to cover the emissions associated with the energy it purchased from OMU, or paying OMU for the NOx allowances based on the monthly market index. KU elected to pay the billed amounts under protest. (Joint Stipulation at ¶ 2.) As of September 2008, KU has paid OMU a total of $5,443,559 for all of the State-Allocated NOx Allowances and Purchased NOx Allowances used in generating the energy taken by KU from ESGS. (Id. at ¶ 2.)

---

[2] The Clean Air Act defines a life-of-the-unit contract as follows:
The term "life-of-the-unit, firm power contractual arrangement" means a unit participation power sales agreement under which a utility or industrial customer reserves, or is entitled to receive, a specified amount or percentage of capacity and associated energy generated by a specified generating unit (or units) and pays its proportional amount of such unit's total costs, pursuant to a contract either-
    (A) for the life of the unit;
    (B) for a cumulative term of no less than 30 years, including contracts that permit an election for early termination; or
    (C) for a period equal to or greater than 25 years or 70 percent of the economic useful life of the unit determined as of the time the unit was built, with option rights to purchase or re-lease some portion of the capacity and associated energy generated by the unit (or units) at the end of the period.

42 U.S.C. § 7651a(27).

In June of 2008, the parties filed cross-motions for summary judgment and supporting memoranda of law concerning the NOx emission allowance issue. [DN 316, DN 310]. OMU took the position that it was the sole owner of all NOx allowances allocated to ESGS under 42 U.S.C. § 7651g(i) and 42 U.S.C. § 7651a(27). (Am. Complaint at ¶¶ 33, 37(g)[DN 211].) KU disagreed arguing that the 1960 Contract meets the federal and state regulatory definitions for a "life-of-the-unit" contract under 42 U.S.C. § 7651a(27), and thus KU should be entitled to its proportional share of the assigned ESGS NOx emission allowances.

In its September 5, 2008, Memorandum Opinion and Order [DN 400], the Court found that the 1960 Contract qualified as a "life-of-the-unit" contract within the Clean Air Act, and consequently, declared that KU "is the owner of a proportionate share of the NOx emission allowances allocated to the Elmer Smith Generating Station No. 2 and that OMU is not the sole owner of those allowances." (DN 400 at 28-29.) The Court concluded that the allocation of "surplus capacity and electric energy then remaining" under Article III, Section 2 of the Contract qualified as a reservation of a "specified amount or percentage of capacity and associated energy" pursuant to the life-of-the-unit contract definition contained in 42 U.S.C. § 7651a(27). (Id. at 24.) The Court also held under the terms of the Contract, the percentage of plant capacity reserved by KU corresponds to the percentage of costs borne by KU, and therefore, satisfied the life-of-the-unit contract definition. (Id. at 29.)

The significance of this conclusion is that KU has paid OMU for allowances which KU owned. Therefore, the current issue before the Court is the amount of money refundable to KU for NOx allowances charges paid by KU to OMU from 2004 to 2008. The parties

have entered into Joint Stipulations of Fact and filed Post-Trial Briefs regarding the amount of money refundable to KU for NOx allowance charges.

### B. Joint Stipulations of Fact

The parties stipulated that from 2004 through 2008, ESGS received a total of 5665 State-Allocated NOx Allowances, all of which were used to cover the total NOx emissions from ESGS for energy taken by KU and OMU. OMU also purchased an additional 563 Purchased NOx Allowances from third parties to cover total plant emissions in excess of ESGS's State-Allocated NOx Allowances, at a cost of $533,305. (DN 473, Joint Stipulation ¶¶ 3, 6.) The term "State-Allocated NOx Allowances" refers to NOx allowances allocated at no charge to ESGS by the State of Kentucky, as distinguished from NOx allowances purchased by OMU from third parties ("Purchased NOx Allowances"). (Id. at ¶ 2 n.1, n.2.) As of September 2008, KU has paid OMU a total of $5,443,559 for the amounts billed by OMU for all of the State-Allocated NOx Allowances and Purchased NOx Allowances used in generating the energy taken by KU from ESGS. (Id. at ¶ 2.)

### C. Discussion

The post-trial briefs submitted by the parties raise three issues with respect to the NOx emission allowances: (1) whether KU's ownership share of ESGS State-Allocated NOx Allowances is based on KU's energy allocation or capacity allocation under the Contract; (2) whether OMU is prohibited under the Contract from charging KU for State-Allocated NOx Allowances because it "incurred no cost" to acquire them; and (3) whether OMU's charges to KU for Purchased NOx Allowances (as contrasted with State-Allocated NOx Allowances)

6

were proper.

### 1. Energy Allocation vs. Capacity Allocation

Pursuant to the 1990 Clean Air Act, utilities that are a party to a "life-of-the-unit, firm power contractual arrangement" are entitled to their proportional share of NOx allowances assigned to that generating unit. 42 U.S.C. § 7651g(i). Specifically, 42 U.S.C. § 7651g(i) recognizes that "allowances will be deemed to be held or distributed in proportion to each holder's legal, equitable, leasehold, or contractual reservation or entitlement." KU maintains that its "proportionate share" of the ESGS State-Allocated NOx Allowances is the share that corresponds to KU's energy allocation -- i.e., the share of ESGS "surplus energy and capacity" actually received by KU pursuant to Article III, Section 3(b) of the Contract. OMU disagrees arguing that KU's proportionate share of the ESGS State-Allocated NOx Allowances is the share that corresponds to KU's capacity allocation -- i.e. the share of ESGS allocated or reserved capacity defined under Article III, Section 3(d) of the Contract.

After consideration of the parties' arguments and the statutory language in question, the Court finds that KU's proportionate share of ESGS State-Allocated NOx Allowances is the share that corresponds to KU's "capacity allocation" as defined under Article III, Section 3(d) of the Contract.

The statutory language of the Clean Air Act supports the distribution of the State-Allocated NOx Allowances in the present case in proportion to KU's capacity allocation, as opposed to energy allocation. In order for the Contract to qualify as a life-of-the-unit contract, KU must be contractually obligated to pay its proportional share of the costs

associated with the "amount or percentage of capacity and associated energy" KU reserved, or is entitled to receive. 42 U.S.C. § 7651a(27). See Ormet, 207 F.3d at 692 (The Act "requires that the customer *reserve a specified amount or percentage* of a plant's capacity and *pay 'its proportional amount'* of the plant's costs."). In its original Memorandum Opinion, the Court accepted KU's argument that the percentage of plant capacity reserved by KU corresponds to the percentage of costs borne by KU pursuant to Article III, Section 3(d) of the Contract. (DN 400 at 27-29); see also Ormet, 207 F.3d at 692. In fact, the Court rejected OMU's argument that the Contract did not satisfy the "proportional" test because the amount of energy KU takes in a year is not identical to KU's share of the capacity costs during the twelve month period. The Court found that "the fact that OMU takes less energy under Section 2 than is 'allocated for use by' it under Section 3 does not change the fact that capacity costs are exactly proportional to the capacity reserved for use by each party." (DN 400 at 27 (citing Ormet, 207 F.3d at 692).) Ultimately, KU's entitlement to ownership of any of the ESGS NOx emission allowances is solely related to KU's capacity allocation under the Contract. Thus, given the requirements of a life-of-the-unit contract, the Court finds it inconsistent to award KU State-Allocated NOx Allowances in proportion to the amount of surplus energy taken by KU when KU doesn't pay the proportional capacity cost for that amount of energy.

For these reasons, in determining the proportion of KU's ownership of State-Allocated NOx Allowances pursuant to 42 U.S.C. § 7651g(i), the Court finds that KU's "contractual reservation or entitlement" is based upon the capacity allocation set forth in Article III,

Section 3(d) of the Contract. Having concluded that KU's ownership of State-Allocated NOx allowances is based on KU's percentage of ESGS capacity, the Court finds that KU owned 2368 State-Allocated NOx Allowances. (Joint Stipulation at ¶ 4, Table 2.) Therefore, KU is entitled to a refund for the amount paid by KU to OMU for the 2368 State-Allocated NOx Allowances.

### 2. Cost of State-Allocated NOx Allowances

KU maintains that regardless of how ownership rights to State-Allocated NOx Allowances are divided, the plain language of the Contract does not permit OMU to charge KU for the use of the State-Allocated NOx Allowances because OMU incurred no actual costs to obtain them. Specifically, KU maintains that under Article III, Section 3 of the Contract, OMU is entitled to charge KU only for the costs OMU actually incurs in generating energy which KU is entitled to take under the Contract. According to KU, the contractual term "cost" does not include the NOx allowances provided by the government to ESGS free of cost. In response, OMU claims that KU impermissibly seeks to advance a claim for declaratory relief beyond the Court's September 5, 2008, Order. Alternatively, OMU maintains that if the Court reaches the merits of this claim, the Court should find that the replacement cost of State-Allocated NOx Allowances is a recoverable cost under the Contract.

Initially, the Court finds that this issue is properly before the Court. Throughout this litigation, KU asserted an ownership interest in a portion of the State-Allocated NOx Allowances and claimed that OMU overcharged KU for the State-Allocated NOx

Allowances. Additionally, KU expressly reserved its right to assert this argument in the joint stipulation. The stipulation acknowledges that "[b]y entering into this stipulation, KU does not stipulate that OMU is entitled to charge KU the market value for State-Allocated NOx Allowances owned by OMU, even if the Court concludes that KU's ownership should be based on capacity allocations, and the parties reserve the right to address the amount to be refunded to KU pursuant to the September 5, 2008 Order in post trial briefs." (Joint Stipulation at ¶ 5.)

The parties do not specifically address what statutory or contractual provision allows OMU to charge KU for NOx allowances that OMU uses in generating the energy KU purchases. However, the parties appear to agree that Article III, Section 3 of the Contract governs the recovery of costs associated with the NOx allowances. Thus, the question before the Court is whether State-Allocated NOx Allowances are costs recoverable under the Contract; and, if so, how these costs are allocated.

Contrary to KU's argument, the Court finds that NOx allowances are actual costs recoverable under the Contract. The Federal Energy Regulatory Commission ("Commission") has repeatedly recognized that "actions taken by utilities to comply with the [Clean Air Act Amendments] are legitimate costs of service that can be recovered from customers." La. Pub. Serv. Comm'n v. Entergy Corp., 123 F.E.R.C. para 61,188, P 34 (2008). "[E]mission allowances are a resource necessary for the generation of power and, thus, . . . the replacement costs of emissions allowances are an actual cost of service." Id. The Commission held that under a wholesale power contract that provides for recovery of

10

incremental costs, "if a utility uses an allowance for the benefit of one of its wholesale customers, the utility can charge that customer for the replacement costs of the allowance even though it paid nothing for the allowance." La. Pub. Serv. Comm'n v. Entergy Corp., 123 F.E.R.C. para 61,188, P 33 (2008) (citing Southern Co. Servs., Inc., 69 F.E.R.C. para 61,437 at 62,555-56 (1994)). Given this case law, the Court finds that the replacement cost of the State-Allocated NOx Allowances is an actual cost which can be passed through to KU under Article III of the Contract.

Having determined that NOx allowances are actual costs under the Contract, the Court finds that the Contract requires the costs of the NOx allowances be allocated based on Article III, Section 3(d) capacity allocations. Under Article III, Section 3(d) of the Contract, any cost not specifically identified in the Contract as either an energy cost or a capacity cost must be allocated according to the parties' capacity allocations. NOx allowance costs are not identified in the Contract as either an "energy" or a "capacity" cost and, therefore, must be allocated on a capacity basis according to the Contract.

Accordingly, allocating the costs of these State-Allocated NOx Allowances on a capacity basis, OMU could have properly charged KU the costs of 2368 State-Allocated NOx Allowances under the Contract. Instead, OMU charged KU the cost of 3285 State-Allocated NOx Allowances resulting in an overcharge of the cost of 917 State-Allocated NOx Allowances. Therefore, KU is entitled to a refund for the amount paid by KU to OMU for the 917 State-Allocated NOx Allowances.

### 3. Purchased NOx Allowances

Additionally, KU seeks to recover part of the cost it paid to OMU for Purchased NOx Allowances arguing that the Contract requires the costs of these allowances be based on the capacity allocation set forth in Article III, Section 3(d). The Court declines to address this claim. KU's counterclaim related only to the State-Allocated NOx Allowances and raised no breach of contract claim regarding the Purchased NOx Allowances. (Am. Counterclaim ¶ 28.) Specifically, in its counterclaim, KU states that "OMU has taken the position that it has ownership rights over all NOx allowances allocated to ESGS Station 2. However, KU has ownership rights to certain of the NOx allowances allocated to Station 2." (Id.) Further, in its original motion for summary judgment, KU represented that the "purchased allowances are not the subject of the dispute between the parties." (DN 310, KU's Memorandum of Law in Support of Motion for Partial Summary Judgment Concerning NOx Emission Allowances at 2.)

### 4. Amount of Refund

The parties stipulated that from 2004 through 2008, ESGS received a total of 5665 State-Allocated NOx Allowances. Based on the decisions set forth above, the Court finds that OMU improperly charged KU for the cost of 3285 State-Allocated NOx Allowances. The parties stipulated that the total amount paid by KU to OMU for NOx allowances through September 2008 was $5,443,559. (Joint Stipulation at ¶ 2.) Of that amount, $301,165 was paid for Purchased NOx Allowances. (Id. at Table 3.) Thus, the refund to KU for the State-Allocated NOx Allowances is $5,142,394 -- the difference between $5,443,559 that KU paid

12

for all the NOx allowances minus $301,165 that KU paid for Purchased NOx Allowances.[3]

### 5. Pre-Judgment Interest

KU seeks an award of prejudgment interest on the refund amount for the NOx allowances. KU proposes a judgment that includes an award of 8% prejudgment interest based on Kentucky's legal rate of interest. See KRS § 360.010. OMU objects to an award of prejudgment interest. OMU argues that KU's claim arises under federal law and, as a result, an award of prejudgment interest is in the discretion of the district court. Green v. Nevers, 196 F.3d 627, 633 (6th Cir. 1999). OMU contends that KU offers nothing in support of its claim for prejudgment interest and, thus, prejudgment interest should not be awarded. Alternatively, OMU argues that if the Court believes an award of prejudgment interest is appropriate, the award should be at the rate set forth in 28 U.S.C. § 1961. Ford v. Uniroyal Pension Plan, 154 F.3d 613, 619 (6th Cir. 1998).

The Court finds that prejudgment interest is appropriate in this case. With respect to the proper rate of interest, the Court finds that KU's claim is one for a refund of monies paid by KU for NOx allowances pursuant to the Contract. Therefore, the Court will award prejudgment interest based on Kentucky's legal rate of interest of 8%.

### 6. Conclusion

KU is entitled to a refund in the amount of $5,142,394 for the State-Allocated NOx

---

[3] All of the refund amounts in KU's brief are in error because KU mistakenly treated the amount KU was billed for allowances ($5,720,670) as the amount it had paid, which was actually $5,443,559. (DN 473, Joint Stipulation at ¶ 2.)

Allowances. Judgment will be entered in favor of KU and against the Plaintiffs in the amount of $5,142,394 together with prejudgment interest at 8% from the date each payment was made by KU until the date of entry of this judgment, and post-judgment interest on the entire amount of the judgment, including interest, at the rate prescribed by 28 U.S.C. § 1961 from the date of judgment until paid in full.

cc: counsel of record